## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| ——————————————x | |
| : | Civil Action No. 1 :20-cv-2809 |
| JON COHEN, on behalf of himself and others : | |
| similarly situated, : | CLASS ACTION COMPLAINT |
| : | |
| Plaintiff, : | Jury Trial Demanded |
| : | |
| v. : | |
| : | |
| WINK LABS, INC., and I.AM.PLUS : | |
| Electronics Inc., : | |
| : | |
| Defendants. x | |
| ——————————————  | |

### Nature of Action

1. Jon Cohen ("Cohen"), on behalf of himself and others similarly situated, brings this class action complaint against Wink Labs, Inc. ("Wink"), and I.AM.PLUS Electronics Inc. ("i.am+") (collectively "Defendants"), as a result of Defendants' decision to unilaterally and abruptly impose monthly subscription fees to the devices they sold to consumers.

2. Specifically, Wink announced on May 6, 2020, that owners of Wink devices would be required to pay $5 per month to keep using the devices they purchased, and if those consumers failed to pay the newly imposed $5 monthly fee, Wink would deactivate those devices.

3. As a result of this fraudulent bait-and-switch pricing scheme, Cohen alleges that Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA"), violated the Magnuson-Moss Warranty Act ("MMWA"), violated the Computer Fraud and Abuse Act ("CFAA"), made both negligent and fraudulent misrepresentations, trespassed on Cohen's chattels, and breached express and implied warranties to consumers.

1

**Parties**

4.     Cohen is a natural person who at all relevant times resided in Cook County, Illinois.

5.     Cohen purchased a Wink Hub 2 on January 7, 2017.

6.     Wink is a corporation headquartered in New York, New York, and incorporated in Delaware.

7.     Wink produces and sells software and hardware that connects with and controls smart home devices and home automation devices from a consolidated user interface.

8.     Upon information and belief, Wink disseminated the misrepresentations and advertisements at issue from its headquarters in New York.

9.     i.am+ is a Delaware corporation and "a Hollywood-based technology company whose mission is to create technology hits that create a ripple effect across pop culture. Our vision is to create a community of creatives and coders and believe that through music and technology as the first step, we can usher in a powerful new era built on AI."[1]

10.     In 2017, i.am+ purchased Wink,[2] and offers Wink products on its home page along with Omega contextual AI products.[3]

**Jurisdiction and Venue**

11.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because, upon information and good faith belief, there are more

---

[1]     https://iamplus.com/company/ (last visited May 8, 2020).

[2]     https://www.cnet.com/news/will-i-am-buys-home-hub-manufacturer-wink/     (last visited May 8, 2020).

[3]     https://iamplus.com/ (last visited May 8, 2020).

than 100 members of the proposed classes, some members of the proposed classes and Defendants are citizens of different states, and the amount in controversy exceeds $5 million.

12.     This Court has personal jurisdiction over Defendants because Defendants have sufficient minimum contacts with Illinois such that the exercise of jurisdiction by this Court over Defendants is consistent with notions of fair play and substantial justice.

13.     Defendants conduct business in Illinois and otherwise avail themselves of the protections and benefits of Illinois law through the promotion, marketing, and sale of Wink products in Illinois, and this action arises out of or relates to these contacts.

14.     Moreover, Defendants' wrongful conduct at issue foreseeably affects consumers in Illinois.

15.     Venue is proper before this Court under 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to the claim occurred in this District, and a substantial part of the property that is the subject of the action is situated in this District.

16.     Indeed, Plaintiff purchased his Wink product in Illinois, and uses his Wink product in Illinois.

### Factual Allegations

17.     The "smart home" and "home automation" market is a growing segment of consumer electronics, covering a range of household devices that are "smart," in that they can be controlled or programmed to operate in different ways than simple, analog devices traditionally purchased for a consumer's home.

18.     For example, a "smart" light bulb can brighten or dim automatically under certain conditions set by a home automation system, or a "smart" thermostat can automatically adjust a home's temperature based on the time of day, weather, or even the home's occupancy.

19.   To control and synchronize all of these various devices, Wink produced and advertised the Wink Hub and later, the Wink Hub 2 (together, the "Wink Hub") as a unifying automation platform that could control all of the smart home devices in a consumer's home.

20.   The Wink Hub is an electronic computerized hub capable of connecting to home internet connections to synchronize the functionality of various smart home devices through the use of an accompanying software application.

21.   Of note, where some Wink competitors required a monthly fee to use their product(s), Defendants advertised that the Wink Hub was different in that it did not require a monthly fee.[4]

22.   Specifically, the Wink Hub was advertised with the following traits, in both online product descriptions, press releases, and product packaging:



---

[4]   *See, e.g.*, https://www.cnet.com/reviews/wink-hub-review/ (last visited May 8, 2020) (comparing the Wink Hub to other products, noting that for its competitor, "[y]ou have to pay a $10 monthly fee to get the most from it.").

## How much does Wink cost?

The Wink app is available for free download from the iTunes App Store and Google Play.

Wink Hub 2 is expected to be available for $99 starting in late October on Wink.com. The Wink Hub is available for $69 on Wink.com while supplies last. Wink Relay is available for $99 on Wink.com.

There are no long-term contracts or required monthly fees





23.     Relying, in part, on Wink's representations that its products would not require a subscription fee—while many of Wink's competitors in the smart home and home automation market *did* require those fees—Cohen decided to purchase a Wink Hub, and later a Wink Hub 2.

24.     Specifically, on January 7, 2017, Cohen purchased a Wink Hub 2 for $99 from Home Depot, an authorized retailer of Wink products.

25.     From 2017 through the present, Cohen has used his Wink Hub to control and operate various home automation and smart home devices without significant problems or service interruptions.

26.     Then, on May 6, 2020, Wink announced that consumers will need to start paying the company $5 per month, beginning May 13, 2020 to continue using its devices:

> Wink's mission for the past 5+ years has been to provide users with a 'Simpler, Smarter Home,' while maintaining privacy for our customers. Our approach to simplicity and security has driven our design from the user experience to the technology behind the scenes.
>
> We understand that a smart home is something that needs to be trusted and dependable, and we recognize that recent events have created some uncertainty around the reliability of the system. We apologize for these inconveniences and want to share some background information as well as the path forward.
>
> Since 2014, Wink has grown to support more than 4 million connected devices. During this time, Wink has relied solely on the one-time fee derived from hardware sales to cover ongoing cloud costs, development, and customer support. Providing users with local and remote access to their devices will always come at a cost for Wink, and over the years we have made great progress toward reducing these costs so that we can maintain that feature.
>
> Wink has taken many steps in an effort to keep your Hub's blue light on, however, long term costs and recent economic events have caused additional strain on our business. Unlike companies that sell user data to offset costs associated with offering free services, we do not. Data privacy is one of Wink's core values, and we believe that user data should never be sold for marketing or any purpose.
>
> We have a lot of great ideas on how to expand on Wink's capabilities and satisfy the many requests from our user base. In order to provide for development and continued growth, we are transitioning to a $4.99 monthly subscription, starting on

May 13, 2020. This fee is designed to be as modest as possible. Your support will enable us to continue providing you with the functionality that you've come to rely on, and focus on accelerating new integrations and app features.

Should you choose not to sign up for a subscription you will no longer be able to access your Wink devices from the app, with voice control or through the API, and your automations will be disabled on May 13. Your device connections, settings and automations can be reactivated if you decide to subscribe at a later date.

27. At the same time, Wink unveiled its required subscription page, advertising one of the core benefits of the Wink subscription being that a consumer could "retain seamless control and monitoring of your smart home devices"—the core purpose of the Wink Hub.

28. Wink's customers were immediately outraged by this abrupt change, comparing Wink's imposition of a subscription fee as "lies" or a "ransom."[5]

29. Bill Fitzgerald, privacy policies researcher for Consumer Reports' Digital Lab, characterized Wink's conduct as "completely outside what most people think of as what's normal and acceptable—or even possible—when they buy something."[6]

30. As a result, Cohen is stuck choosing to either pay $5 a month to keep his $99 device, or forfeit the entire functionality of the Wink Hub.

31. Cohen does not intend to pay a subscription fee to use the Wink Hub that he already purchased and paid for in full.

32. Had Cohen known that the Wink Hub would later require mandatory subscription fees to perform its core functionality, he either would not have purchased the Wink Hub, or would have paid substantially less for it.

---

[5] https://www.techhive.com/article/3542631/wink-users-revolt-following-its-sudden-shift-to-a-subscription-model.html (last visited May 8, 2020).

[6] https://www.consumerreports.org/wink/wink-tells-users-pay-up-or-we-will-disable-smart-home-hub/ (last visited May 8, 2020).

33.     Upon information and good faith belief, Wink acted as i.am+'s agent in imposing a subscription fee for Wink products and disabling devices for consumers that did not agree to pay that monthly fee.

34.     Upon information and good faith belief, i.am+ authorized Wink to unilaterally impose a subscription fee for Wink products and disable devices for consumers that did not agree to pay that monthly fee.

35.     Upon information and good faith belief, i.am+ ratified Wink's imposition of a subscription fee for Wink products and decision to disable devices for consumers that did not agree to pay that monthly fee by knowingly accepting the benefits of Wink's conduct.

### Class Allegations

36.     Cohen brings this action as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following classes:

*Nationwide Class*: All residents of the United States who purchased a Wink Hub or Wink Hub 2 on or before May 5, 2020.

*Illinois Class*: All residents of the State of Illinois who purchased a Wink Hub or Wink Hub 2 on or before May 5, 2020.

37.     Excluded from the classes are Defendants, their officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had controlling interests.

38.     The proposed classes satisfy Rule 23(a)(1) because, upon information and belief, the class members are so numerous that joinder of all of them is impracticable.

39.     The exact number of class members is unknown to Cohen at this time and can only be determined through appropriate discovery.

40. The proposed classes are ascertainable because they are defined by reference to objective criteria.

41. The proposed classes satisfy Rules 23(a)(2) and 23(a)(3) because Cohen's claims are typical of the claims of the members of the classes.

42. To be sure, the claims of Cohen and all members of the classes originate from the same conduct, practice, and procedure on the part of Defendants, and Cohen possesses the same interests and has suffered the same injuries as each member of the proposed classes.

43. Cohen satisfies Rule 23(a)(4) because he will fairly and adequately protect the interests of the members of the classes, and he has retained counsel experienced and competent in class action litigation.

44. Cohen has no interests that are irrevocably contrary to or in conflict with the members of the classes that he seeks to represent.

45. There will be little difficulty in the management of this action as a class action.

46. Issues of law and fact common to the members of the classes predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the classes.

47. Among the issues of law and fact common to the classes are:

    a. Whether the Wink Hub is fit for the ordinary purposes for which the goods are used;

    b. Whether Wink's conduct complied with its express warranties regarding the Wink Hub;

    c. Whether Wink's conduct complied with implied warranties regarding the Wink Hub;

d.  Whether Wink's advertisements regarding the functionality of the Wink Hub were false or misleading;

e.  Whether Wink's advertisements regarding the Wink Hub's price were false or misleading;

f.  Whether Wink engaged in deceptive or unfair acts and practices in violation of the CFA;

g.  Whether Wink intentionally disabled Wink Hub devices in violation of the CFAA;

h.  Whether Wink trespassed on the property of the classes by updating and disabling Wink Hub devices;

i.  Whether i.am+ is liable for Wink's conduct to the classes;

j.  Whether Defendants' conduct injured the classes;

k.  Whether Defendants were unjustly enriched by their conduct;

l.  the availability of damages, punitive damages, and/or injunctive relief; and

m.  the availability of attorneys' fees and costs.

48.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

49.  Furthermore, as the damages suffered by individual members of the classes may be relatively small, the expense and burden of individual litigation make it impracticable for the members of the classes to individually redress the wrongs done to them.

50.  As well, even for those class members who could afford to litigate such a claim, it would remain an economically impractical alternative.

51.  In the alternative, the classes may also be certified because:

a.  the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudication with respect to individual class members that would establish incompatible standards of conduct for Defendants;

b.  the prosecution of separate actions by individual class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

c.  Defendants have acted or refused to act on grounds generally applicable to the classes thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the classes as a whole; and/or

d.  Certification of specific issues such as Defendants' liability is appropriate.

52.     Adequate notice can be given to class members directly using information maintained in Defendants' records, records of its approved vendors or other third parties, or through notice by publication.

## Causes of Action

### COUNT I
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On behalf of the Illinois Class)

53.     Cohen repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 52.

54.     Cohen brings this claim on behalf of himself and the Illinois Class.

55.     Defendants' actions, as alleged above, violate the express warranty statute of the state of Illinois. 810 ILCS § 5/2-314.

56.     Defendants were at all relevant times "merchants" with respect to home automation devices and "sellers" of home automation device under 810 ILCS 5/2-314.

57.     The Wink Hub was at all relevant times a "good" within the meaning of 810 ILCS 5/2-314.

58.     A warranty that the Wink Hub was in merchantable condition and fit for the ordinary purpose for which such equipment is used is implied by law pursuant to 810 ILCS 5/2-314.

59.     The Wink Hub is not in merchantable condition and is not fit for the ordinary purpose for which home automation devices are used as a result of Defendants' conduct as described herein.

60.     Specifically, Defendants' actions rendered the Wink Hub as unmerchantable because the devices will be disabled and deprived of their basic functionality long before the end of their expected useful life.

61.     Cohen would not have purchased a Wink Hub, or would have paid substantially less than he did, if he knew that Defendants intended to disable the core functionality of the Wink Hub if consumers did not pay a newly-added monthly subscription fee.

62.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Cohen and the other Illinois class members have been damaged in an amount to be proven at trial.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(On behalf of the Illinois Class)**

63.      Cohen repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 52.

64.     Cohen brings this claim on behalf of himself and the Illinois Class.

65.     Defendants' actions, as alleged above, violate the express warranty statute of the state of Illinois. 810 ILCS § 5/2-313.

66.     Defendants were at all relevant times "merchants" with respect to home automation devices and "sellers" of home automation device under 810 ILCS 5/2-313.

67.     The Wink Hub was at all relevant times a "good" within the meaning of 810 ILCS 5/2-313.

68.     Wink, through its advertisements and product labeling, expressly warranted that the Wink Hub could function as a home automation device without requiring that consumers pay a monthly subscription fee.

69.     Specifically, Wink advertised that its products had "no long-term contracts or required monthly fees."

70.     However, Wink is now requiring consumers to pay monthly fees in order to operate the devices that they have already paid for in full.

71.     Cohen would not have purchased a Wink Hub, or would have paid substantially less than he did, if he knew that Defendants intended to disable the core functionality of the Wink Hub if consumers did not pay newly-added monthly subscription fee.

72.     As a direct and proximate result of Defendants' breach of express warranties, Cohen and the other Illinois class members have been damaged in an amount to be proven at trial.

**COUNT III**
**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT**
**18 U.S.C. § 1030, *et seq.***
**(On behalf of the Nationwide Class)**

73.      Cohen repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 52.

74.     Cohen brings this claim on behalf of himself and the Nationwide Class, or, in the alternative, on behalf of the Illinois Class.

75.     The Wink Hub is a protected computer within the meaning of the CFAA. 18 U.S.C. §1030(e)(2).

76.     Defendant intents to intentionally transmit an update to all Wink Hub devices—or the software used to operate those devices—in a manner that requires Wink Hub users to accept the update in order to continue using Wink Hub devices.

77.     This update is intended to cause damage to the functionality of Wink Hub and its associated software so that owners of the Wink Hub are unable to use their device without separately subscribing to and paying a new monthly fee.

78.     Cohen and the class members did not provide Defendants with authorization to access their Wink Hub devices for purposes of destroying the functionality of their Wink Hub devices.

79.     The firmware/software update Defendants intentionally transmitted to the Wink Hub devices in fact intentionally cause damage to it, resulting in a useless product, unless Cohen or class members agree to pay a separate fee to maintain the product's core functionality.

80.     As a direct and proximate result of Defendants' intentional disabling of the Wink Hub devices, Cohen and the members of the classes sustained damages and other losses in an amount to be determined at trial.

81.     Defendants' conduct damaged Cohen and the members of the classes, who are entitled to recover damages, equitable relief, and/or other relief as appropriate, in accordance with 18 U.S.C. § 1030(g).

**COUNT IV**
**BREACH OF IMPLIED WARRANTY**
**PURSUANT TO THE MAGNUSON-MOSS WARRANTY ACT**
**15 U.S.C. § 2301, *et seq.***
**(On behalf of the Nationwide Class)**

82.     Cohen repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 52.

83.     Cohen brings this claim on behalf of himself and the Nationwide Class, or, in the alternative, on behalf of the Illinois Class.

84.     Cohen and the class members are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301.

85.     Wink is a "supplier" and "warrantor" within the meaning of § 2301.

86.     The Wink Hub is a "consumer product" within the meaning of § 2301.

87.     Wink made implied warranties arising under state law regarding the Wink Hub within the meaning of § 2301(7).

88.     Wink's warranties were the basis of the bargain of the contract between Cohen and Wink for the sale of the Wink Hub to Cohen.

89.     Wink has been afforded a reasonable opportunity to cure its breach of warranties.

90.     The amount in controversy of Cohen's and the class members' individual claims meets or exceeds the sum of $25.

91.     The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

92.     Further, Wink breached these implied warranties because the Wink Hub does not perform as Wink represented or it is not fit for its intended use and Wink affirmatively took steps to create the Wink Hub's failure to perform as it represented; Wink changed the Wink Hub to a

non-merchantable condition; and because Wink intentionally created the defects and nonconformities at issue, and has no intention to cure these defects and nonconformities.

93.     Wink violated the MMWA by failing to comply with the implied warranties it made to the class by, among other things: (a) selling Wink Hub devices which operate without any additional subscription fees, while intending to later charge subscription fees to operate the Wink Hub as advertised; (b) disabling the Wink Hub devices of consumers who do not agree to pay Wink's unilaterally-added subscription fee; and (c) warranting that the Wink Hub could be used with "no long-term contracts or required monthly fees" while requiring Wink Hub purchasers to pay required monthly fees.

94.     Resorting to any informal dispute settlement procedure and/or affording Defendants another opportunity to cure these breaches of warranties is unnecessary and/or futile.

95.     Any remedies available through any informal dispute settlement procedure would be inadequate under the circumstances, as Wink has intentionally created the problems associated with the Wink Hub, and, as such, has indicated it has no desire to participate in such a process at this time.

96.     Any requirement—whether under the MMWA or otherwise—that Cohen resort to an informal dispute resolution procedure and/or afford Wink a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

97.     As a direct and proximate result of Defendants' breach of the MMWA, Cohen and the members of the classes sustained damages and other losses in an amount to be determined at trial.

## COUNT V
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT
### (On behalf of the Illinois Class)

98.     Cohen repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 52.

99.     Defendants are "persons" as that term is defined in 815 ILCS 505/1(c).

100.    Cohen and the members of the Illinois Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

101.    The CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

102.    In the course of Defendants' business, Wink concealed and suppressed material facts concerning the Wink Hub's core functionality and ability to operate without a mandatory monthly subscription fee, with the intent that Cohen and the Illinois Class would rely on those representations to their detriment and Defendants' benefit.

103.    Wink thus violated the Act by, at minimum, failing to disclose that it intended to charge Wink Hub purchasers a monthly $5 subscription fee to maintain the core functionality of Wink Hub devices, despite advertising repeatedly that it would impose no monthly fees at any time.

104.     Wink is affirmatively disabling Wink Hub devices owned by consumers who do not agree to pay the newly-imposed monthly subscription fee, notwithstanding its statements and advertisements that the Wink Hub would not require such a fee.

105.     i.am+ is authorizing and ratifying Wink's decision to impose new subscription fees on its customers.

106.     Defendants knew or should have known that its conduct violates the CFA.

107.     As a direct and proximate result of Defendants' unlawful methods, acts, and practices, Cohen and the Illinois Class members incurred actual damages, in that they purchased Wink Hub devices that they otherwise would not have, or they paid more than they otherwise would have for their Wink Hub devices.

108.     Meanwhile, Defendants have sold more Wink Hub devices than they otherwise could have and charged inflated prices for the Wink Hub, thereby unjustly benefiting from their conduct.

109.     Cohen seeks monetary damages, including punitive damages, appropriate injunctive relief, reasonable attorneys' fees and costs, and other relief as the Court may deem necessary, pursuant to 815 ILCS 505/10a.

## COUNT VI
## TRESPASS TO CHATTELS
### (On behalf of the Nationwide Class)

110.     Cohen repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 52.

111.     On January 7, 2017, and at all relevant times thereafter, Cohen owned and possessed an operational Wink Hub device.

112.     On May 6, 2020, Wink announced that, on May 13, 2020, it would—in effect—unlawfully take from Cohen's possession and the possession of all class members an operational Wink Hub device through its forced update, leaving Cohen and the class members with a worthless device, unless Cohen and the class members agreed to pay a new fee to unlock the functionality of their device.

113.     By reason of the unlawful taking of their property, Cohen and the class have each sustained damages consisting of the fair market value of the property in the amount of approximately $99.

## COUNT VII
## NEGLIGENT MISREPRESENTATION
### (On behalf of the Nationwide Class)

114.     Cohen repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 52.

115.      Wink made material misrepresentations of fact to Cohen and the class concerning the core functionality and price of the Wink Hub, as well as consumers' ability to operate the Wink Hub after purchasing the device.

116.     At the time the representations were made, Defendants knew, or by the exercise of reasonable care, should have known that the statements were false and that Defendants would impose additional fees for continued operation of the Wink Hub.

117.     Wink made such claims about the Wink Hub with the intent to induce Cohen and the class members to purchase Wink Hubs.

118.     Plaintiff and the class members justifiably relied upon Wink's misrepresentations about the functionality and pricing structure of the Wink Hub.

119.    Cohen and the class members have suffered harm as the result of Defendants' misrepresentations and omissions of material fact.

## COUNT VIII
## FRAUDULENT MISREPRESENTATION
### (On behalf of the Nationwide Class)

120.    Cohen repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 52.

121.    Wink made material misrepresentations of fact to Cohen and the class concerning the core functionality and price of the Wink Hub, as well as consumers' ability to operate the Wink Hub after purchasing the device.

122.    At the time the representations were made, Defendants knew that their statements were false and that Defendants would impose additional fees for continued operation of the Wink Hub.

123.    In the alternative, Defendants intentionally contradicted their prior representations to consumers in order to fraudulently obtain additional payments from their customers, while threatening to disable Wink Hub devices if the owners of those devices did not pay those newly imposed fees.

124.    Wink made such claims about the Wink Hub with the intent to induce Cohen and the class members to purchase Wink Hubs.

125.    Plaintiffs and the class members justifiably relied upon Wink's misrepresentations about the functionality and pricing structure of the Wink Hub.

126.    Cohen and the class members have suffered harm as the result of Defendants' misrepresentations and omissions of material fact.

## COUNT IX
## UNJUST ENRICHMENT
### (On behalf of the Nationwide Class)

127.    Cohen repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 52.

128.    Cohen brings this claim on behalf of himself and the Nationwide Class.

129.    Defendants have benefitted from selling at an unjust profit Wink Hub devices whose value is diminished by Defendants' decision to impose monthly fees on Wink customers in order to use the devices they already paid for—in full—or face deactivation of their devices, and Cohen and the class members have accordingly overpaid for the Wink Hub.

130.    Defendants have received and retained unjust benefits from Cohen and the class members, and inequity has resulted.

131.    It is inequitable and unconscionable for Defendants to retain these benefits.

132.    Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

133.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Cohen and the class members, in an amount to be proven at trial.

### Conclusion

**WHEREFORE**, Cohen respectfully requests relief and judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Adjudging and declaring that Defendants violated the CFA, violated the MMWA, violated the CFAA, made both negligent and fraudulent misrepresentations, trespassed

on Cohen's chattels and the chattels of the classes, and breached their express and implied warranties to Cohen and the classes;

C.  Declaring that Defendants have engaged in the wrongful conduct alleged;

D.  Awarding Cohen and members of the classes actual, consequential, and/or compensatory damages, and pre-judgment and post-judgment interest;

E.  Awarding injunctive relief, including but not limited to restitution to Cohen and members of the classes;

F.  Awarding Cohen and members of the classes their reasonable costs and attorneys' fees incurred in this action, including expert fees; and

G.  Awarding other and further relief as the Court may deem just and proper.

## TRIAL BY JURY

Cohen is entitled to and hereby demands a trial by jury.

Dated:  May 8, 2020                         Respectfully submitted,

                                            */s/ Aaron D. Radbil*
                                            Aaron D. Radbil
                                            Greenwald Davidson Radbil PLLC
                                            401 Congress Avenue, Suite 1540
                                            Austin, TX  78701
                                            Tel: (512) 322-3912
                                            aradbil@gdrlawfirm.com

                                            *Counsel for Plaintiff and the proposed classes*