## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| JON COHEN, CHRISTOPHER TRAN, and BENJAMIN WALTER, on behalf of themselves and others similarly situated, | Civil Action No. 1:20-cv-02809 |
|  | **AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | Jury Trial Demanded |
| v. | District Judge Mary M. Rowland |
| WINK LABS, INC., and I.AM.PLUS Electronics Inc., | Magistrate Judge Gabriel A. Fuentes |
| Defendants. |  |

### Nature of Action

1.     Jon Cohen ("Cohen"), Christopher Tran ("Tran"), and Benjamin Walter ("Walter") (collectively, "Plaintiffs"), on behalf of themselves and others similarly situated, bring this class action complaint against Wink Labs, Inc. ("Wink") and I.AM.PLUS Electronics Inc. ("i.am+") (collectively "Defendants"), as a result of Defendants' decision to unilaterally and abruptly impose monthly subscription fees for devices they sold to consumers—devices that Defendants marketed and advertised as having "no monthly fees or subscriptions."

2.     Specifically, Wink first announced on May 6, 2020 that owners of Wink devices would be required to pay $5 per month to keep using the devices they purchased, and if those consumers failed to pay the newly imposed $5 monthly fee, Wink would deactivate those devices.

3.     Following intense consumer backlash (and the filing of this lawsuit), Wink delayed its implementation of its $5 monthly fee until July 27, 2020, while all the while maintaining that consumers who do not pay the $5 subscription fee would lose access to the vast majority of Wink device features.

1

4.    As a result of this fraudulent bait-and-switch pricing scheme, Plaintiffs allege that Defendants violated (1) the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA"), (2) the Maine Unfair Trade Practices Act ("UTPA"), (3) the California Unfair Competition Law ("UCL"), (4) the California Consumers Legal Remedies Act ("CLRA"), (5) the California False Advertising Law ("FAL"), (6) the Magnuson-Moss Warranty Act ("MMWA"), and (7) the Computer Fraud and Abuse Act ("CFAA").

5.    Additionally, Plaintiffs allege that Defendants made both negligent and fraudulent misrepresentations, trespassed on Plaintiffs' chattels, and breached express and implied warranties to consumers.

**Parties**

6.    Cohen is a natural person who at all relevant times resided in Lake County, Illinois.

7.    Cohen purchased a Wink Hub 1 in 2014 and a Wink Hub 2 on January 7, 2017.

8.    Tran is a natural person who at all relevant times resided in Orange County, California.

9.    Tran purchased a Wink Hub 1 in 2014, and a Wink Hub 2 in 2017.

10.    Walter is a natural person who at all relevant times resided in Hancock County, Maine, and the U.S. Virgin Islands.

11.    Walter purchased four Wink Hub 1 devices in 2017.

12.    Wink is a corporation headquartered in New York, New York, and incorporated in Delaware.

13.    Wink produces and sells software and hardware that connects with and controls smart home devices and home automation devices from a consolidated user interface.

14.     Upon information and belief, Wink disseminated the misrepresentations and false advertisements at issue from its headquarters in New York.

15.     i.am+ is a Delaware corporation and "a Hollywood-based technology company whose mission is to create technology hits that create a ripple effect across pop culture. Our vision is to create a community of creatives and coders and believe that through music and technology as the first step, we can usher in a powerful new era built on AI."[1]

16.     In 2017, i.am+ purchased Wink,[2] and offers Wink products on its home page along with Omega contextual AI products.[3]

### Jurisdiction and Venue

17.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because, upon information and good faith belief, there are more than 100 members of the proposed classes, some members of the proposed classes and Defendants are citizens of different states, and the amount in controversy exceeds $5 million.

18.     This Court has personal jurisdiction over Defendants because Defendants have sufficient minimum contacts with Illinois such that the exercise of jurisdiction by this Court over Defendants is consistent with notions of fair play and substantial justice.

19.     Defendants conduct business in Illinois and otherwise avail themselves of the protections and benefits of Illinois law through the promotion, marketing, and sale of Wink products in Illinois, and this action arises out of or relates to these contacts.

---

[1]     https://iamplus.com/company/ (last visited July 24, 2020).

[2]     https://www.cnet.com/news/will-iams-i-am-buys-home-hub-manufacturer-wink/ (last visited July 24, 2020).

[3]     https://iamplus.com/ (last visited July 24, 2020).

20.     Moreover, Defendants' wrongful conduct at issue foreseeably affects consumers in Illinois.

21.     Venue is proper before this Court under 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to the claim occurred in this District, and a substantial part of the property that is the subject of the action is situated in this District.

22.     Indeed, Cohen purchased his Wink products in Illinois, and uses his Wink products in Illinois.

## Factual Allegations

### I.     Defendants advertised and promised that Wink devices would not require a monthly subscription or fee.

23.     The "smart home" and "home automation" market is a growing segment of consumer electronics, covering a range of household devices that are "smart," in that they can be controlled or programmed to operate in different ways than simple, analog devices traditionally purchased for a consumer's home.

24.     For example, a "smart" light bulb can brighten or dim automatically under certain conditions set by a home automation system, or a "smart" thermostat can automatically adjust a home's temperature based on the time of day, weather, or even the home's occupancy.

25.     To control and synchronize all of these various devices, Wink produced and advertised the Wink Hub and later, the Wink Hub 2 (together, the "Wink Hub") as a unifying automation platform that could control all of the smart home devices in a consumer's home.

26.     The Wink Hub is an electronic computerized hub capable of connecting to home internet connections to synchronize the functionality of various smart home devices through the use of an accompanying software application.

4

27.   Of note, where some Wink competitors required a monthly fee to use their product(s), Defendants advertised that the Wink Hub was different in that it did not require a monthly fee.[4]

28.   Specifically, the Wink Hub was advertised with the following traits, in both online product descriptions, press releases, and product packaging:



---

[4]   *See, e.g.*, https://www.cnet.com/reviews/wink-hub-review/ (last visited July 22, 2020) (comparing the Wink Hub to other products, noting that for its competitor, "[y]ou have to pay a $10 monthly fee to get the most from it.").

## How much does Wink cost?

The Wink app is available for free download from the **iTunes App Store** and **Google Play**.

Wink Hub 2 is expected to be available for $99 starting in late October on **Wink.com**. The Wink Hub is available for $69 on **Wink.com** while supplies last. Wink Relay is available for $99 on **Wink.com**.

There are no long-term contracts or required monthly fees



**wink** LOOKOUT

THE SMART START TO A SECURE HOME. ONLY $199.

LEARN MORE

✓ No Required Monthly Fees
✓ Real Human Support
✓ Free Shipping in the US
✓ 30 Day Return Policy



## II.    Plaintiffs Purchased and Used Wink Devices.

29.    Relying, in part, on Wink's representations that its products would not require a subscription fee—while many of Wink's competitors in the smart home and home automation market *did* require those fees—Plaintiffs decided to purchase Wink Hub devices.

### A.    Jon Cohen

30.    Cohen purchased a Wink Hub 1 sometime around 2014, and a Wink Hub 2 in 2017.

31.    Specifically, on January 7, 2017, Cohen purchased a Wink Hub 2 for $99 from Home Depot, an authorized retailer of Wink products.

32.    From 2017 through the present, Cohen has used his Wink Hub to control and operate various home automation and smart home devices without significant problems or service interruptions.

33.    In fact, Cohen purchased approximately $500 worth of home automation devices that rely on the Wink Hub to control and operate those devices, including automated lighting and devices to safely control and operate his home fireplace.

34.    Had Cohen known that the Wink Hub would later require mandatory subscription fees to perform its core functionality, he either would not have purchased the Wink Hub, or would have paid substantially less for it.

### B.    Christopher Tran

35.    Tran purchased a Wink Hub 1 sometime around 2014, and a Wink Hub 2 in 2017.

36.    Specifically, on April 25 2017, Tran purchased a Wink Hub 2 for $86.99 from Amazon, an authorized retailer of Wink products.

37.    From 2017 through the present, Tran has used his Wink Hub to control and operate various home automation and smart home devices without significant problems or service interruptions.

7

38.     In fact, Tran purchased approximately $800 worth of home automation devices that rely on the Wink Hub to control and operate those devices, ranging from home security devices to "smart" ceiling fans to lighting and temperature control devices.

39.     Had Tran known that the Wink Hub would later require mandatory subscription fees to perform its core functionality, he either would not have purchased the Wink Hub, or would have paid substantially less for it.

**C.     Benjamin Walter**

40.     Walter purchased multiple Wink Hub 1 devices in 2015 and 2016.

41.     Specifically, on October 10, 12, and 23, 2015, as well as on May 2, 2016, Walter purchased Wink Hub devices primarily for security use in his home and multiple rental properties located in both Maine and the U.S. Virgin Islands.

42.     From 2017 through the present, Walter has used his Wink Hub to control and operate various home automation and smart home devices without significant problems or service interruptions.

43.     In fact, Walter purchased approximately $700 worth of home automation devices that rely on the Wink Hub to control and operate those devices, ranging from home security devices to smoke and carbon dioxide sensing devices.

44.     Had Walter known that the Wink Hub would later require mandatory subscription fees to perform its core functionality, he either would not have purchased the Wink Hub, or would have paid substantially less for it.

III. **Defendants abruptly announced that Wink devices would require a monthly subscription and fee.**

45. Despite its product packaging, advertising, and product description pages expressly warranting to the contrary, on May 6, 2020, Wink announced that consumers will need to start paying the company $5 per month, beginning May 13, 2020, to continue using its devices:

> Wink's mission for the past 5+ years has been to provide users with a 'Simpler, Smarter Home,' while maintaining privacy for our customers. Our approach to simplicity and security has driven our design from the user experience to the technology behind the scenes.

> We understand that a smart home is something that needs to be trusted and dependable, and we recognize that recent events have created some uncertainty around the reliability of the system. We apologize for these inconveniences and want to share some background information as well as the path forward.

> Since 2014, Wink has grown to support more than 4 million connected devices. During this time, Wink has relied solely on the one-time fee derived from hardware sales to cover ongoing cloud costs, development, and customer support. Providing users with local and remote access to their devices will always come at a cost for Wink, and over the years we have made great progress toward reducing these costs so that we can maintain that feature.

> Wink has taken many steps in an effort to keep your Hub's blue light on, however, long term costs and recent economic events have caused additional strain on our business. Unlike companies that sell user data to offset costs associated with offering free services, we do not. Data privacy is one of Wink's core values, and we believe that user data should never be sold for marketing or any purpose.

> We have a lot of great ideas on how to expand on Wink's capabilities and satisfy the many requests from our user base. In order to provide for development and continued growth, we are transitioning to a $4.99 monthly subscription, starting on May 13, 2020. This fee is designed to be as modest as possible. Your support will enable us to continue providing you with the functionality that you've come to rely on, and focus on accelerating new integrations and app features.

> Should you choose not to sign up for a subscription you will no longer be able to access your Wink devices from the app, with voice control or through the API, and your automations will be disabled on May 13. Your device connections, settings and automations can be reactivated if you decide to subscribe at a later date.

46.     At the same time, Wink unveiled its required subscription page, advertising one of the core benefits of the Wink subscription being that a consumer could "retain seamless control and monitoring of your smart home devices"—the core purpose of the Wink Hub.[5]

47.     Wink's customers were immediately outraged by this abrupt change, comparing Wink's imposition of a subscription fee as "lies" or a "ransom."[6]

48.     Bill Fitzgerald, privacy policies researcher for Consumer Reports' Digital Lab, characterized Wink's conduct as "completely outside what most people think of as what's normal and acceptable—or even possible—when they buy something."[7]

49.     As a result of Wink's decision announcing that it would impose mandatory subscription fees, or disable its products for consumers who did not agree to pay the "ransom," on May 8, 2020 Cohen filed a class action complaint against Defendants. *See* ECF No. 1.

50.     Shortly thereafter, on or about May 13, 2020, Wink emailed consumers to announce a one-week delay in its subscription deadline:

> We have received a lot of feedback from you regarding the recent announcement of our subscription service. Many of you have led the way by endorsing us through subscriptions and we are extremely grateful for that show of support. We will be focusing our efforts on stabilizing, improving and enhancing Wink through the subscriptions we receive, as we strive toward being the best smart home experience.
>
> We understand that this is a sudden change during a difficult time for many and we regret if this change has caused you any inconvenience. We can appreciate that some of you may need additional time to subscribe or make alternate considerations. We listened and have extended the deadline by an additional week so you now have until May 20, 2020, to subscribe. For those who have already

---

[5]     https://subscription.wink.com/login (last visited July 24, 2020).

[6]     https://www.techhive.com/article/3542631/wink-users-revolt-following-its-sudden-shift-to-a-subscription-model.html (last visited July 22, 2020).

[7]     https://www.consumerreports.org/wink/wink-tells-users-pay-up-or-we-will-disable-smart-home-hub/ (last visited July 22, 2020).

signed up, there is no further action required, and you will not be billed until May 20.[8]

51.    Then, on May 20, 2020, Wink announced that it was delaying the implementation of its mandatory subscription fee:

> The support we've seen for our subscription service has been incredible. We feel we can extend Wink's free service for the time being, confident that we can set a new start date for the subscription service soon, giving you all more time to use Wink whether you signed up or not.[9]

52.    Contrary to Wink's public statements, however, consumer support for the implementation of this mandatory subscription fee was far from "incredible."

53.    Rather, media outlets characterized Wink's delay as a response to "withering criticism,"[10] "significant customer backlash,"[11] and "backpedal[ing] on that initial plan with somewhat dubious comments. . . if you believe that Wink got so many people to promise to pay that they don't need to actually pay right now -- I have a bridge to sell you."[12]

54.    Then, on July 8, 2020, Wink issued a new public statement setting a July 27, 2020 deadline for consumers to pay for Wink's mandatory subscription service:

Hello Wink Community,

---

[8]      https://www.macobserver.com/news/wink-extends-subscription-deadline/ (last visited July 24, 2020).

[9]      https://twitter.com/TheWinkApp/status/1263287236939984896 (last visited July 22, 2020).

[10]      https://www.techhive.com/article/3545294/wink-relents-delays-mandatory-switch-to-paid-subscriptions-indefinitely.html (last visited July 24, 2020).

[11]      https://www.subscriptioninsider.com/business-models/wink-delays-subscription-move-indefinitely-after-customer-backlash (last visited July 24, 2020).

[12]      https://www.androidcentral.com/wink-backpedals-its-monthly-subscription-rollout (last visited July 24, 2020).

We want to share updates about our Wink subscription - a vital change for Wink that will enable us to provide our customers with a strong and growing smart home experience. The change will bring about expanded support for new brand integrations and continue to bring enhancements through firmware and software updates.

Please know that we have adjusted our timelines since our initial announcement on May 6th to allow users more opportunity to make considerations. We were able to extend our service so that subscriptions will now begin on Monday, July 27th, 2020. All users who have not already subscribed will need to visit subscription.wink.com to sign up. Users with a Hub on their account should subscribe with the same email address that is registered with their Hub. Paid subscribers can continue using all of their connected devices, cloud services, automations, and 3rd party integrations.

Users who do not sign up will still have access to limited functionality without being charged. This will specifically allow for local control over select devices, such as those found in the Lights + Power menu, as well as Z-Wave connected Locks.[13]

55.     The "limited functionality" Wink describes is further detailed by a laundry-list of

features that Wink previously provided to consumers that Wink would now disable:

---

[13]         https://blog.wink.com/ (last visited July 22, 2020).

56.     Wink previously advertised that these features were available to consumers without subscription fees.

57.     Upon information and good faith belief, Wink acted as i.am+'s agent in imposing a subscription fee for Wink products and disabling devices for consumers that did not agree to pay that monthly fee.

58.     Upon information and good faith belief, i.am+ authorized Wink to unilaterally impose a subscription fee for Wink products and disable devices for consumers that did not agree to pay that monthly fee.

59.     Upon information and good faith belief, i.am+ ratified Wink's imposition of a subscription fee for Wink products and decision to disable devices for consumers that did not agree to pay that monthly fee by knowingly accepting the benefits of Wink's conduct.

**IV.     As a result of Defendants' misrepresentations, Plaintiffs face difficult and expensive choices to maintain their home automation systems.**

60.     As a result of Defendants' sudden imposition of mandatory subscription fees, Plaintiffs are forced to (i) pay $5 each month to keep their Wink Hub devices; (ii) discard their Wink Hub devices and purchase replacement devices to mimic the Wink Hub's functionality; or (iii) forfeit the primary functionality of the Wink Hub and associated home automation devices.

61.     Although Defendants have already stripped some of the features from the Wink Hub, and will further disable the Wink Hub's functionality on July 27, 2020, Cohen does not intend to pay a subscription fee to use the Wink Hub that he already purchased and paid for in full.

62.     Cohen will therefore no longer be able to use the "robots" programming function, which enabled him to automatically shut down his home fireplace after a pre-determined interval of time, which Cohen previously used as a safety mechanism to protect his home and family while operating his fireplace.

63.     As a result, Cohen believes his Wink Hub is now nearly worthless.

64.     On the other hand, in anticipation of Defendants' July 27, 2020 deadline to pay a subscription fee, Tran felt forced to replace the Wink Hub with different home automation devices.

65.     Specifically, Tran purchased a Samsung SmartThings Hub and Lutron Smart Bridge, for a total price in excess of $130, to replace the Wink Hub.

66.     However, some of the home automation devices—such as ceiling fans—that Tran used with his Wink Hub are still not fully compatible with the SmartThings Hub or Lutron Smart Bridge devices.

67.     Tran would not have purchased these replacement devices—and incurred the additional expenses—if Defendants did not impose the mandatory $5 monthly subscription fee.

68.     Lastly, due to his use of Wink devices in multiple properties in multiple states and U.S. territories, Walter is unable to replace his Wink devices, and unable to accept the loss in functionality associated with the Wink Hub if he does not pay the mandatory $5 subscription fee.

69.     Further, due to the ongoing COVID-19 pandemic, Walter believes that he is unable to safely travel from his current home in the U.S. Virgin Islands to replace his home automation systems in his properties in Maine.

70.     Walter is unwilling to risk damage to his properties as a result of the loss in functionality for his security systems if he does not pay Defendants' newly imposed $5 monthly subscription fee.

71.     As a result, Walter believes that he is forced to pay Defendants' $5 monthly subscription fee in order to protect his properties from irreparable harm, until it is safe to travel and replace the Wink devices.

72.     Walter would not have agreed to pay Defendants' newly imposed $5 monthly subscription fee if he believed that he could safely travel to replace the Wink devices at his properties.

### Class Allegations

73.     Plaintiffs bring this action as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following classes:

> *Nationwide Class*: All residents of the United States who purchased a Wink Hub or Wink Hub 2 on or before May 5, 2020.

> *California Class*: All residents of the State of California who purchased a Wink Hub or Wink Hub 2 on or before May 5, 2020.

> *Illinois Class*: All residents of the State of Illinois who purchased a Wink Hub or Wink Hub 2 on or before May 5, 2020.

> *Maine Class*: All residents of the State of Maine who purchased a Wink Hub or Wink Hub 2 on or before May 5, 2020.

74.     Excluded from the classes are Defendants, their officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had controlling interests.

75.     The proposed classes satisfy Rule 23(a)(1) because, upon information and belief, the class members are so numerous that joinder of all of them is impracticable.

76.     The exact number of class members is unknown to Plaintiffs at this time and can only be determined through appropriate discovery.

77.     The proposed classes are ascertainable because they are defined by reference to objective criteria.

78.     The proposed classes satisfy Rules 23(a)(2) and 23(a)(3) because Plaintiffs' claims are typical of the claims of the members of the classes.

79.     To be sure, the claims of Plaintiffs and all members of the classes originate from the same conduct, practice, and procedure on the part of Defendants, and Plaintiffs possess the same interests and have suffered the same injuries as each member of the Nationwide Class.

80.     In addition, Cohen possesses the same interests and has suffered the same injuries as each member of the Illinois class. Likewise, Tran possesses the same interests and has suffered the same injuries as each member of the California class, while Walter possesses the same interests and has suffered the same injuries as each member of the Maine class.

81.     Plaintiffs satisfy Rule 23(a)(4) because they will fairly and adequately protect the interests of the members of the classes, and they have retained counsel experienced and competent in class action litigation.

82.     Plaintiffs have no interests that are irrevocably contrary to or in conflict with the members of the classes that they seek to represent.

83.     There will be little difficulty in the management of this action as a class action.

84.     Issues of law and fact common to the members of the classes predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the classes.

85.     Among the issues of law and fact common to the classes are:

   a.   Whether the Wink Hub is fit for the ordinary purposes for which the goods are used;

   b.   Whether Wink's conduct complied with its express warranties regarding the Wink Hub;

   c.   Whether Wink's conduct complied with implied warranties regarding the Wink Hub;

d.   Whether Wink's advertisements regarding the functionality of the Wink Hub were false or misleading;

e.   Whether Wink's advertisements regarding the Wink Hub's price were false or misleading;

f.   Whether Wink engaged in deceptive or unfair acts and practices in violation of the CFA;

g.   Whether Wink engaged in deceptive or unfair acts and practices in violation of the UTPA;

h.   Whether Wink engaged in deceptive or unfair acts and practices in violation of the UCL;

i.   Whether Wink engaged in deceptive or unfair acts and practices in violation of the CLRA;

j.   Whether Wink intentionally disabled Wink Hub devices in violation of the CFAA;

k.   Whether Wink trespassed on the property of the classes by updating and disabling Wink Hub devices;

l.   Whether i.am+ is liable for Wink's conduct to the classes;

m.   Whether Defendants' conduct injured the classes;

n.   Whether Defendants were unjustly enriched by their conduct;

o.   the availability of damages, punitive damages, and/or injunctive relief; and

p.   the availability of attorneys' fees and costs.

86.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

87.     Furthermore, as the damages suffered by individual members of the classes may be relatively small, the expense and burden of individual litigation make it impracticable for the members of the classes to individually redress the wrongs done to them.

88.     As well, even for those class members who could afford to litigate such a claim, it would remain an economically impractical alternative.

89.     In the alternative, the classes may also be certified because:

   a.   the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudication with respect to individual class members that would establish incompatible standards of conduct for Defendants;

   b.   the prosecution of separate actions by individual class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

   c.   Defendants have acted or refused to act on grounds generally applicable to the classes thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the classes as a whole; and/or

   d.   Certification of specific issues such as Defendants' liability is appropriate.

90.     Adequate notice can be given to class members directly using information maintained in Defendants' records, records of its approved vendors or other third parties, or through notice by publication.

**Causes of Action**

**COUNT I**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(On behalf of the Illinois Class)**

91.     Cohen repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 90.

92.     Cohen brings this claim on behalf of himself and the Illinois Class.

93.     Defendants' actions, as alleged above, violate the express warranty statute of the state of Illinois. 810 ILCS § 5/2-314.

94.     Defendants were at all relevant times "merchants" with respect to home automation devices and "sellers" of home automation devices under 810 ILCS § 5/2-314.

95.     The Wink Hub was at all relevant times a "good" within the meaning of 810 ILCS § 5/2-314.

96.     A warranty that the Wink Hub was in merchantable condition and fit for the ordinary purpose for which such equipment is used is implied by law pursuant to 810 ILCS § 5/2-314.

97.     The Wink Hub is not in merchantable condition and is not fit for the ordinary purpose for which home automation devices are used as a result of Defendants' conduct as described herein.

98.     Specifically, Defendants' actions rendered the Wink Hub as unmerchantable because the devices will be disabled and deprived of their basic functionality long before the end of their expected useful life.

99.     Cohen would not have purchased a Wink Hub, or would have paid substantially less than he did, if he knew that Defendants intended to disable the core functionality of the Wink Hub if he did not pay a newly added monthly subscription fee.

100.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Cohen and the other Illinois class members have been damaged in an amount to be proven at trial.

## COUNT II
## BREACH OF EXPRESS WARRANTY
### (On behalf of the Illinois Class)

101.     Cohen repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 90.

102.     Cohen brings this claim on behalf of himself and the Illinois Class.

103.     Defendants' actions, as alleged above, violate the express warranty statute of the state of Illinois. 810 ILCS § 5/2-313.

104.     Defendants were at all relevant times "merchants" with respect to home automation devices and "sellers" of home automation devices under 810 ILCS § 5/2-313.

105.     The Wink Hub was at all relevant times a "good" within the meaning of 810 ILCS § 5/2-313.

106.     Wink, through its advertisements and product labeling, expressly warranted that the Wink Hub could function as a home automation device without requiring that consumers pay a monthly subscription fee.

107.     Specifically, Wink advertised that its products had "no long-term contracts or required monthly fees."

108.    However, Wink is now requiring consumers to pay monthly fees in order to operate the devices that they have already paid for in full.

109.    Cohen would not have purchased a Wink Hub, or would have paid substantially less than he did, if he knew that Defendants intended to disable the core functionality of the Wink Hub if consumers did not pay newly added monthly subscription fee.

110.    As a direct and proximate result of Defendants' breach of express warranties, Cohen and the other Illinois class members have been damaged in an amount to be proven at trial.

### COUNT III
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On behalf of the California Class)

111.    Tran repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 90.

112.    Tran brings this claim on behalf of himself and the California Class.

113.    Defendants' actions, as alleged above, violate the express warranty statute of the state of California. Cal. Com. Code § 2314.

114.    Defendants were at all relevant times "merchants" with respect to home automation devices under Cal. Com. Code § 2104(1) and "sellers" of home automation devices under § 2103(1)(d).

115.    The Wink Hub was at all relevant times a "good" within the meaning of Cal. Com. Code § 2105(1).

116.    A warranty that the Wink Hub was in merchantable condition and fit for the ordinary purpose for which such equipment is used is implied by law pursuant to Cal. Com. Code § 2314.

117. The Wink Hub is not in merchantable condition and is not fit for the ordinary purpose for which home automation devices are used as a result of Defendants' conduct as described herein.

118. Specifically, Defendants' actions rendered the Wink Hub as unmerchantable because the devices will be disabled and deprived of their basic functionality long before the end of their expected useful life.

119. Tran would not have purchased a Wink Hub, or would have paid substantially less than he did, if he knew that Defendants intended to disable the core functionality of the Wink Hub if consumers did not pay a newly added monthly subscription fee.

120. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Tran and the other California class members have been damaged in an amount to be proven at trial.

## COUNT IV
## BREACH OF EXPRESS WARRANTY
### (On behalf of the California Class)

121. Tran repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 90.

122. Tran brings this claim on behalf of himself and the California Class.

123. Defendants' actions, as alleged above, violate the express warranty statute of the state of California. Cal. Com. Code § 2313.

124. Defendants were at all relevant times "merchants" with respect to home automation devices under Cal. Com. Code § 2104(1) and "sellers" of home automation devices under § 2103(1)(d).

125. The Wink Hub was at all relevant times a "good" within the meaning of Cal. Com. Code § 2105(1).

126. Wink, through its advertisements and product labeling, expressly warranted that the Wink Hub could function as a home automation device without requiring that consumers pay a monthly subscription fee.

127. Specifically, Wink advertised that its products had "no long-term contracts or required monthly fees."

128. However, Wink is now requiring consumers to pay monthly fees in order to operate the devices that they have already paid for in full.

129. Tran would not have purchased a Wink Hub, or would have paid substantially less than he did, if he knew that Defendants intended to disable the core functionality of the Wink Hub if consumers did not pay newly added monthly subscription fee.

130. As a direct and proximate result of Defendants' breach of express warranties, Tran and the other California class members have been damaged in an amount to be proven at trial.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On behalf of the Maine Class)

131. Walter repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 90.

132. Walter brings this claim on behalf of himself and the Maine Class.

133. Defendants' actions, as alleged above, violate the express warranty statute of the state of Maine. Me. Rev. Stat. Tit. 11 § 2-314.

23

134.    Defendants were at all relevant times "merchants" with respect to home automation devices under Me. Rev. Stat. Ann. Tit. 11 § 2-104(1), and "sellers" of home automation devices under § 2-103(1)(d).

135.    The Wink Hub was at all relevant times a "good" within the meaning of Me. Rev. Stat. Ann. Tit. 11 § 2-105(1).

136.    A warranty that the Wink Hub was in merchantable condition and fit for the ordinary purpose for which such equipment is used is implied by law pursuant to Me. Rev. Stat. Tit. 11 § 2-314.

137.    The Wink Hub is not in merchantable condition and is not fit for the ordinary purpose for which home automation devices are used as a result of Defendants' conduct as described herein.

138.    Specifically, Defendants' actions rendered the Wink Hub as unmerchantable because the devices will be disabled and deprived of their basic functionality long before the end of their expected useful life.

139.    Walter would not have purchased a Wink Hub, or would have paid substantially less than he did, if he knew that Defendants intended to disable the core functionality of the Wink Hub if consumers did not pay a newly added monthly subscription fee.

140.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Walter and the other Maine class members have been damaged in an amount to be proven at trial.

## COUNT VI
## BREACH OF EXPRESS WARRANTY
### (On behalf of the Maine Class)

141.     Walter repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 90.

142.     Walter brings this claim on behalf of himself and the Maine Class.

143.     Defendants' actions, as alleged above, violate the express warranty statute of the state of Maine. Me. Rev. Stat. Tit. 11 §§ 2-313.

144.     Defendants were at all relevant times "merchants" with respect to home automation devices under Me. Rev. Stat. Ann. Tit. 11 § 2-104(1), and "sellers" of home automation devices under § 2-103(1)(d).

145.     The Wink Hub was at all relevant times a "good" within the meaning of Me. Rev. Stat. Ann. Tit. 11 § 2-105(1).

146.     Wink, through its advertisements and product labeling, expressly warranted that the Wink Hub could function as a home automation device without requiring that consumers pay a monthly subscription fee.

147.     Specifically, Wink advertised that its products had "no long-term contracts or required monthly fees."

148.     However, Wink is now requiring consumers to pay monthly fees in order to operate the devices that they have already paid for in full.

149.     Walter would not have purchased a Wink Hub, or would have paid substantially less than he did, if he knew that Defendants intended to disable the core functionality of the Wink Hub if consumers did not pay newly added monthly subscription fee.

150.    As a direct and proximate result of Defendants' breach of express warranties, Walter and the other Maine class members have been damaged in an amount to be proven at trial.

## COUNT VII
## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
### 18 U.S.C. § 1030, *et seq.*
### (On behalf of the Nationwide Class)

151.    Plaintiffs repeat and re-allege each and every factual allegation contained in paragraphs 1 through 90.

152.    Plaintiffs brings this claim on behalf of themselves and the Nationwide Class.

153.    The Wink Hub is a protected computer within the meaning of the CFAA. 18 U.S.C. §1030(e)(2).

154.    Defendants intend to—or already have—intentionally transmitted an update to all Wink Hub devices—or the software used to operate those devices—in a manner that requires Wink Hub users to accept the update in order to continue using Wink Hub devices.

155.    This update is intended to cause damage to the functionality of Wink Hub and its associated software so that owners of the Wink Hub are unable to use their device without separately subscribing to and paying a new monthly fee.

156.    Plaintiffs and the class members did not provide Defendants with authorization to access their Wink Hub devices for purposes of destroying the functionality of their Wink Hub devices.

157.    The firmware/software update Defendants intentionally transmitted to the Wink Hub devices in fact intentionally cause damage to it, resulting in a useless product, unless Plaintiffs or class members agree to pay a separate fee to maintain the product's core functionality.

158.    As a direct and proximate result of Defendants' intentional disabling of the Wink Hub devices, Plaintiffs and the members of the classes sustained damages and other losses in an amount to be determined at trial.

159.    Defendants' conduct damaged Plaintiffs and the members of the classes, who are entitled to recover damages, equitable relief, and/or other relief as appropriate, in accordance with 18 U.S.C. § 1030(g).

**COUNT VIII**
**BREACH OF IMPLIED WARRANTY**
**PURSUANT TO THE MAGNUSON-MOSS WARRANTY ACT**
**15 U.S.C. § 2301, *et seq.***
**(On behalf of the Nationwide Class)**

160.    Plaintiffs repeat and re-allege each and every factual allegation contained in paragraphs 1 through 90.

161.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the respective state Classes.

162.    Plaintiffs and the class members are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301.

163.    Wink is a "supplier" and "warrantor" within the meaning of § 2301.

164.    The Wink Hub is a "consumer product" within the meaning of § 2301.

165.    Wink made implied warranties arising under state law regarding the Wink Hub within the meaning of § 2301(7).

166.    Wink's warranties were the basis of the bargain of the contract between Plaintiffs and Wink for the sale of the Wink Hubs to Plaintiffs.

167.    Wink has been afforded a reasonable opportunity to cure its breach of warranties.

168.    The amount in controversy of Plaintiffs' and the class members' individual claims meets or exceeds the sum of $25.

169.    The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

170.    Further, Wink breached these implied warranties because the Wink Hub does not perform as Wink represented or it is not fit for its intended use and Wink affirmatively took steps to create the Wink Hub's failure to perform as it represented; Wink changed the Wink Hub to a non-merchantable condition; and because Wink intentionally created the defects and nonconformities at issue, and has no intention to cure these defects and nonconformities.

171.    Wink violated the MMWA by failing to comply with the implied warranties it made to the Nationwide Class by, among other things: (a) selling Wink Hub devices which operate without any additional subscription fees, while intending to later charge subscription fees to operate the Wink Hub as advertised; (b) disabling the Wink Hub devices of consumers who do not agree to pay Wink's unilaterally added subscription fee; and (c) warranting that the Wink Hub could be used with "no long-term contracts or required monthly fees" while requiring Wink Hub purchasers to pay required monthly fees.

172.    Resorting to any informal dispute settlement procedure and/or affording Defendants another opportunity to cure these breaches of warranties is unnecessary and/or futile.

173.    Any remedies available through any informal dispute settlement procedure would be inadequate under the circumstances, as Wink has intentionally created the problems associated with the Wink Hub, and, as such, has indicated it has no desire to participate in such a process at this time.

174.     Any requirement—whether under the MMWA or otherwise—that Plaintiffs resort to an informal dispute resolution procedure and/or afford Wink a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

175.     As a direct and proximate result of Defendants' breach of the MMWA, Plaintiffs and the members of the classes sustained damages and other losses in an amount to be determined at trial.

**COUNT IX**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT**
**(On behalf of the Illinois Class)**

176.     Cohen repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 90.

177.     Defendants are "persons" as that term is defined in 815 ILCS § 505/1(c).

178.     Cohen and the members of the Illinois Class are "consumers" as that term is defined in 815 ILCS § 505/1(e).

179.     The CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS § 505/2.

180.     In the course of Defendants' business, Wink concealed and suppressed material facts concerning the Wink Hub's core functionality and ability to operate without a mandatory monthly subscription fee, with the intent that Cohen and the Illinois Class would rely on those representations to their detriment and Defendants' benefit.

29

181.    Wink thus violated the CFA by, at minimum, failing to disclose that it intended to charge Wink Hub purchasers a monthly $5 subscription fee to maintain the core functionality of Wink Hub devices, despite advertising repeatedly that it would impose no monthly fees at any time.

182.    Wink is affirmatively disabling Wink Hub devices owned by consumers who do not agree to pay the newly imposed monthly subscription fee, notwithstanding its statements and advertisements that the Wink Hub would not require such a fee.

183.    i.am+ is authorizing and ratifying Wink's decision to impose new subscription fees on its customers.

184.    Defendants knew or should have known that their conduct violates the CFA.

185.    As a direct and proximate result of Defendants' unlawful methods, acts, and practices, Cohen and the Illinois Class members incurred actual damages, in that they purchased Wink Hub devices that they otherwise would not have, or they paid more than they otherwise would have for their Wink Hub devices.

186.    Meanwhile, Defendants have sold more Wink Hub devices than they otherwise could have and charged inflated prices for the Wink Hub, thereby unjustly benefiting from their conduct.

187.    Cohen seeks monetary damages, including punitive damages, appropriate injunctive relief, reasonable attorneys' fees and costs, and other relief as the Court may deem necessary, pursuant to 815 ILCS § 505/10a.

## COUNT X
## VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT
### (On behalf of the Maine Class)

188.    Walter repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 90.

189.    Defendants, Walter, and the Maine Class are "persons" as that term is defined in Me. Rev. Stat. Ann. Tit. 5, § 206(2).

190.    Defendants are engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. Tit. 5, § 206(3).

191.    The UTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Me. Rev. Stat. Ann. Tit. 5 § 207.

192.    In the course of Defendants' business, Wink concealed and suppressed material facts concerning the Wink Hub's core functionality and ability to operate without a mandatory monthly subscription fee, with the intent that Walter and the Maine Class would rely on those representations to their detriment and Defendants' benefit.

193.    Wink thus violated the UTPA by, at minimum, failing to disclose that it intended to charge Wink Hub purchasers a monthly $5 subscription fee to maintain the core functionality of Wink Hub devices, despite advertising repeatedly that it would impose no monthly fees at any time.

194.    Wink is affirmatively disabling Wink Hub devices owned by consumers who do not agree to pay the newly imposed monthly subscription fee, notwithstanding its statements and advertisements that the Wink Hub would not require such a fee.

195.    i.am+ is authorizing and ratifying Wink's decision to impose new subscription fees on its customers.

196.    Defendants knew or should have known that their conduct violates the UTPA.

197.    As a direct and proximate result of Defendants' unlawful methods, acts, and practices, Walter and the Maine Class members incurred actual damages, in that they purchased Wink Hub devices that they otherwise would not have, or they paid more than they otherwise would have for their Wink Hub devices, and they purchased additional devices that necessarily rely on the Wink Hub to function.

198.    Meanwhile, Defendants have sold more Wink Hub devices than they otherwise could have and charged inflated prices for the Wink Hub, thereby unjustly benefiting from their conduct.

199.    Walter seeks monetary damages, including punitive damages, appropriate injunctive relief, reasonable attorneys' fees and costs, and other relief as the Court may deem necessary, pursuant to Me. Rev. Stat. Ann. Tit. 5 § 213.

200.    Contemporaneous with the filing of this amended complaint, Walter sent a letter complying with Me. Rev. Stat. Ann. Tit. 5, § 213(1-A) to Defendants.

201.    However, because Defendants have not remedied their unlawful conduct after receiving notice from Cohen's initial complaint on May 8, 2020, compliance with this demand requirement should be excused and thereby deemed satisfied.

## COUNT XI
## VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT
### (On behalf of the California Class)

202.    Tran repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 90.

203.    Defendants are "persons" as that term is defined in Cal. Civ. Code § 1761(c).

204.    Tran and the members of the California Class are "consumers" as that term is defined in Cal. Civ. Code § 1761(d).

205.    The CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

206.    In the course of Defendants' business, Wink concealed and suppressed material facts concerning the Wink Hub's core functionality and ability to operate without a mandatory monthly subscription fee, with the intent that Tran and the California Class would rely on those representations to their detriment and Defendants' benefit.

207.    Wink thus violated the CLRA by, at minimum, failing to disclose that it intended to charge Wink Hub purchasers a monthly $5 subscription fee to maintain the core functionality of Wink Hub devices, despite advertising repeatedly that it would impose no monthly fees at any time.

208.    Wink is affirmatively disabling Wink Hub devices owned by consumers who do not agree to pay the newly imposed monthly subscription fee, notwithstanding its statements and advertisements that the Wink Hub would not require such a fee.

209.    i.am+ is authorizing and ratifying Wink's decision to impose new subscription fees on its customers.

210.    Defendants knew or should have known that their conduct violates the CLRA.

211.    As a direct and proximate result of Defendants' unlawful methods, acts, and practices, Tran and the California Class members incurred actual damages, in that they purchased Wink Hub devices that they otherwise would not have, or they paid more than they otherwise would have for their Wink Hub devices, or they paid for replacement devices after their Wink Hub

devices were deactivated, and they purchased additional devices that necessarily rely on the Wink Hub to function.

212.    Meanwhile, Defendants have sold more Wink Hub devices than they otherwise could have and charged inflated prices for the Wink Hub, thereby unjustly benefiting from their conduct.

213.    Under Cal. Civ. Code § 1780(a), Tran and the California Class seek monetary relief against Defendants measured as the diminution of the value of their Wink Hub devices caused by Defendants' violations of the CLRA as alleged herein.

214.    Under Cal. Civ. Code § 1780(b), Tran seeks an additional award against Defendants of up to $5,000 for each California Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.

215.    Defendants knew or should have known that their conduct was directed to one or more California Class members who are senior citizens or disabled persons. Defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.

216.    One or more California Class members who are senior citizens or disabled persons are substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Defendants' conduct.

217.    Tran also seeks punitive damages against Defendants because they carried out reprehensible conduct with willful and conscious disregard of the rights of others, subjecting Tran and the California Class to potential unjust hardship as a result.

218.     Defendants intentionally and willfully deceived Tran on matters that affect home safety or home security, and concealed material facts that only Defendants knew.

219.     Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under Cal. Civ. Code § 3294.

220.     Tran further seeks an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of court, attorneys' fees under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

221.      Contemporaneous with the filing of this amended complaint, Tran sent a letter complying with Cal. Civ. Code § 1780(b) to Defendants.

222.     However, because Defendants have not remedied their unlawful conduct after receiving notice from Cohen's initial complaint on May 8, 2020, compliance with this demand requirement should be excused and thereby deemed satisfied.

### COUNT XII
### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
#### (On behalf of the California Class)

223.     Tran repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 90.

224.     The UCL prohibits any "unlawful, unfair, or fraudulent business act or practices." California Business and Professions Code § 17200.

225.     In the course of Defendants' business, Wink concealed and suppressed material facts concerning the Wink Hub's core functionality and ability to operate without a mandatory monthly subscription fee, with the intent that Tran and the California Class would rely on those representations to their detriment and Defendants' benefit.

226.     Wink thus violated the UCL by, at minimum, failing to disclose that it intended to charge Wink Hub purchasers a monthly $5 subscription fee to maintain the core functionality of Wink Hub devices, despite advertising repeatedly that it would impose no monthly fees at any time.

227.     Wink is affirmatively disabling Wink Hub devices owned by consumers who do not agree to pay the newly imposed monthly subscription fee, notwithstanding its statements and advertisements that the Wink Hub would not require such a fee.

228.     i.am+ is authorizing and ratifying Wink's decision to impose new subscription fees on its customers.

229.     Defendants knew or should have known that their conduct violates the UCL.

230.     As a direct and proximate result of Defendants' unlawful methods, acts, and practices, Tran and the California Class members incurred actual damages, in that they purchased Wink Hub devices that they otherwise would not have, or they paid more than they otherwise would have for their Wink Hub devices, or they paid for replacement devices after their Wink Hub devices were deactivated, and they purchased additional devices that necessarily rely on the Wink Hub to function.

231.     Meanwhile, Defendants have sold more Wink Hub devices than they otherwise could have and charged inflated prices for the Wink Hub, thereby unjustly benefiting from their conduct.

232.     Tran seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants under Cal. Bus. & Prof. Code § 17200.

233.     Tran requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to

restore to Tran and members of the California Class any money they acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

## COUNT XIII
## VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW
### (On behalf of the California Class)

234.     Tran repeats and re-alleges each and every factual allegation contained in paragraphs 1 through 90.

235.     The FAL states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." California Bus. & Prof. Code § 17500.

236.     In the course of Wink's business, Wink caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Wink, to be untrue and misleading to consumers, including Tran and the other California Class members.

237.     Wink thus violated the FAL by, at minimum, failing to disclose that it intended to charge Wink Hub purchasers a monthly $5 subscription fee to maintain the core functionality of Wink Hub devices, despite advertising repeatedly that it would impose no monthly fees at any time.

238. Wink has violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of Wink Hubs as set forth in this Complaint were material and likely to deceive a reasonable consumer.

239. i.am+ is authorizing and ratifying Wink's decision to impose new subscription fees on its customers.

240. Defendants knew or should have known that their conduct violates the FAL.

241. As a direct and proximate result of Defendants' unlawful methods, acts, and practices, Tran and the California Class members incurred actual damages, in that they purchased Wink Hub devices that they otherwise would not have, or they paid more than they otherwise would have for their Wink Hub devices, or they paid for replacement devices after their Wink Hub devices were deactivated, and they purchased additional devices that necessarily rely on the Wink Hub to function.

242. Meanwhile, Defendants have sold more Wink Hub devices than they otherwise could have and charged inflated prices for the Wink Hub, thereby unjustly benefiting from their conduct.

243. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Wink's business.

244. Wink's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

245. Tran requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class members any money Wink acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT XIV
## TRESPASS TO CHATTELS
### (On behalf of the Nationwide Class)

246. Plaintiffs repeat and re-allege each and every factual allegation contained in paragraphs 1 through 90.

247. In 2017 and at all relevant times thereafter, Plaintiffs owned and possessed operational Wink Hub devices.

248. On May 6, 2020, Wink announced that, on May 13, 2020, it would—in effect—unlawfully take from Plaintiffs' possession and the possession of all class members an operational Wink Hub device through its forced update, leaving Plaintiffs and the class members with a worthless device, unless Plaintiffs and the class members agreed to pay a new fee to unlock the functionality of their device.

249. After repeated delay, Wink instead announced that, on July 27, 2020, it would—in effect—unlawfully take from Plaintiffs' possession and the possession of all class members an operational Wink Hub device through its forced update, leaving Plaintiffs and the class members with a dramatically limited and functionally worthless device, unless Plaintiffs and the class members agreed to pay a new fee to unlock the functionality of their device.

250. By reason of the unlawful taking of their property, Plaintiffs and the class have each sustained damages consisting of the fair market value of the property in the amount of approximately $99, and the consequential loss of their other home automation devices that require the Wink Hub to operate.

251. Additionally, by reason of the unlawful taking of their property, Tran has sustained damages consisting of the fair market value of the property he was required to purchase to replace the Wink Hub disabled by Defendants' unlawful taking.

## COUNT XV
## NEGLIGENT MISREPRESENTATION
### (On behalf of the Nationwide Class)

252.    Plaintiffs repeat and re-allege each and every factual allegation contained in paragraphs 1 through 90.

253.    Wink made material misrepresentations of fact to Plaintiffs and the Nationwide Class concerning the core functionality and price of the Wink Hub, as well as consumers' ability to operate the Wink Hub after purchasing the device.

254.    At the time the representations were made, Defendants knew, or by the exercise of reasonable care, should have known that the statements were false and that Defendants would impose additional fees for continued operation of the Wink Hub.

255.    Wink made such claims about the Wink Hub with the intent to induce Plaintiffs and the class members to purchase Wink Hubs.

256.    Plaintiffs and the class members justifiably relied upon Wink's misrepresentations about the functionality and pricing structure of the Wink Hub.

257.    Plaintiffs and the class members have suffered harm as the result of Defendants' misrepresentations and omissions of material fact.

## COUNT XVI
## FRAUDULENT MISREPRESENTATION
### (On behalf of the Nationwide Class)

258.    Plaintiffs repeat and re-allege each and every factual allegation contained in paragraphs 1 through 90.

259.    Wink made material misrepresentations of fact to Plaintiffs and the Nationwide Class concerning the core functionality and price of the Wink Hub, as well as consumers' ability to operate the Wink Hub after purchasing the device.

260.    At the time the representations were made, Defendants knew that their statements were false and that Defendants would impose additional fees for continued operation of the Wink Hub.

261.    In the alternative, Defendants intentionally contradicted their prior representations to consumers in order to fraudulently obtain additional payments from their customers, while threatening to disable Wink Hub devices if the owners of those devices did not pay those newly imposed fees.

262.    Wink made such claims about the Wink Hub with the intent to induce Plaintiffs and the class members to purchase Wink Hubs.

263.    Plaintiffs and the class members justifiably relied upon Wink's misrepresentations about the functionality and pricing structure of the Wink Hub.

264.    Plaintiffs and the class members have suffered harm as the result of Defendants' misrepresentations and omissions of material fact.

## COUNT XVII
## UNJUST ENRICHMENT
### (On behalf of the Nationwide Class)

265.    Plaintiffs repeat and re-allege each and every factual allegation contained in paragraphs 1 through 90.

266.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

267.    Defendants have benefitted from selling at an unjust profit Wink Hub devices whose value is diminished by Defendants' decision to impose monthly fees on Wink customers in order to use the devices they already paid for—in full—or face deactivation of their devices, and Plaintiffs and the class members have accordingly overpaid for the Wink Hub.

268.    Defendants have received and retained unjust benefits from Plaintiffs and the class members, and inequity has resulted.

269.    It is inequitable and unconscionable for Defendants to retain these benefits.

270.    Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

271.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs and the class members, in an amount to be proven at trial.

**Conclusion**

**WHEREFORE**, Plaintiffs respectfully request relief and judgment as follows:

A.  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.  Adjudging and declaring that Defendants violated the CFA, violated the UCL, violated the DTPA, violated the CLRA, violated the FAL, violated the MMWA, violated the CFAA, made both negligent and fraudulent misrepresentations, trespassed on Plaintiffs' chattels and the chattels of the classes, and breached their express and implied warranties to Plaintiffs and the classes;

C.  Declaring that Defendants have engaged in the wrongful conduct alleged;

D.  Awarding Plaintiffs and members of the classes actual, consequential, and/or compensatory damages, and pre-judgment and post-judgment interest;

E.  Awarding injunctive relief, including but not limited to restitution to Plaintiffs and members of the classes;

F.  Awarding Plaintiffs and the members of the classes their reasonable costs and attorneys' fees incurred in this action, including expert fees; and

G.  Awarding other and further relief as the Court may deem just and proper.

## TRIAL BY JURY

Plaintiffs are entitled to and hereby demand a trial by jury.


Dated:  July 27, 2020                    Respectfully submitted,

                                         */s/ Aaron D. Radbil*
                                         Aaron D. Radbil
                                         Greenwald Davidson Radbil PLLC
                                         401 Congress Avenue, Suite 1540
                                         Austin, TX  78701
                                         Tel: (512) 322-3912
                                         aradbil@gdrlawfirm.com

                                         *Counsel for Plaintiffs and the proposed classes*

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2020, I filed a copy of the foregoing electronically using

the Clerk of Court's CM/ECF system, which will provide notice to all counsel of record.


                                         */s/ Aaron D. Radbil*
                                         Aaron D. Radbil